NATIONAL UNION FIRE
INSURANCE CO.

v.

ALLFIRST BANK, et al.

No. CIV.A.WMN–02–1591.

United States District Court,
D. Maryland.

Sept. 5, 2003.

Robert W Ludwig, Jr, Ludwig and Robinson PLLC, Salvatore Scanio, Ludwig and Robinson PLLC, Glenn J Melcher, Ludwig and Robinson PLLC, Michael John Kresslein, Ludwig and Robinson PLLC, Washington, DC, for National Union Fire Insurance Company of Pittsburgh, PA, Plaintiff.

Jacqueline Marie Wood, Miles and Stockbridge PC, Baltimore, Matthew S Sturtz, Miles and Stockbridge, Towson, Grady C. Frank, Jr., LeClair Ryan PC, Rebecca E Kuehn, LeClair Ryan PC, Stephen Keith Gallagher, LeClair Ryan, Alexandria, VA, John S Simcox, Simcox and Barclay LLP, Karen Montgomery Crabtree, Simcox and Barclay LLP, Annapolis, Brian L. Moffet, Gordon Feinblatt Rothman Hoffberger and Hollander LLC, Dennis P. McGlone, Gordon Feinblatt Rothman Hoffberger and Hollander LLC, Baltimore, for Allfirst Bank, A division of Allfirst Financial, Inc., First Union National Bank, Chevy Chase Bank, F.S.B., Suntrust Bank, Bank of America, N.A., Defendants.

## *MEMORANDUM*

NICKERSON, Senior District Judge.

Before the Court are the following dispositive motions: Defendant Allfirst Bank's Motion for Summary Judgment, Paper No. 71; Defendant Suntrust Bank's Motion for Summary Judgment, Paper No. 73; Defendant First Union National Bank's Motion for Summary Judgment, Paper No. 78; Plaintiff's Motion for Summary Judgment against Defendant First Union National Bank, Paper No. 75; and Plaintiff's Motion for Partial Summary Judgment against Defendant Allfirst, Paper No. 76. In addition, there are several other motions pending that are more procedural in nature: Defendant Suntrust Bank's Motion for Leave to File Amended Answer, Paper No. 79; and Plaintiff's Motion for Leave to Amend Complaint, Paper No. 80.[1] Upon a review of the pleadings and the applicable case law, the Court determines that no hearing is necessary and that Defendants' Motions for Summary Judgment will be granted, and those of Plaintiff, denied. In addition, Defendant Suntrust's motion for leave to amend its answer will be granted, and Plaintiff's motion for leave to amend complaint denied.

## *I. FACTUAL AND PROCEDURAL BACKGROUND*

This action has its origin in a fraud scheme allegedly perpetrated by Steven

---

1. In addition, Plaintiff has filed a Motion for Leave to File Supplemental Memorandum in Opposition to Defendants' Motions for Summary Judgment Based on New Authority, Paper No. 110, as well as a second Motion for Leave to File Supplemental Memorandum in Opposition to Defendants' Motions for Summary Judgment, Paper No. 122. The Court will grant the first motion to supplement, although the "new authority" that it brings to the Court's attention is no more helpful for Plaintiff than the other case law on which it relies; it is distinguishable from the case at bar for the same reasons. The Court will deny the second motion as it does nothing more than regurgitate arguments already made, in triplicate, in Plaintiff's prior pleadings.

Mack against his former employer, the Kaiser Foundation Health Plan of the Mid–Atlantic States (Kaiser). The scheme was relatively straightforward. During a two month period from June 2000 to August 2000, a series of fraudulent invoices were introduced into Kaiser's account payable stream by several different individuals and companies. Mack, who was employed in Kaiser's accounts payable department, aided those individuals or entities by providing copies of legitimate invoices and information concerning Kaiser's accounts payable procedures.

The scheme was also relatively transparent. The Court notes that Kaiser issued checks for over $135,000 for dental chairs, despite the fact that Kaiser does not provide dental services of any kind. *See* Suntrust Exhs. 6, 7; Dep. of William Lisanty at 164. Kaiser also issued a check for over $65,000 on an invoice purporting to be billing for "Wiggettchair" assemblies. *See* Suntrust Exh. 12. Kaiser's own Accounts Payable Supervisor during the period in question confirmed that not one of the invoices that was part of this scheme was "even close to being properly payable." Dep. of William Lawson at 141.

As a result of the submission of those invoices, 15 large checks were issued, for an amount totaling approximately $1 million. The checks were delivered to the payees identified on the fraudulent invoices and deposited in those payees' accounts at various banks. Defendant Allfirst Bank was the depository bank for six of the checks: one made payable to "Not Just Computers," four made payable to "Just Computers," and one made payable to "DCNJC." Kaiser's subsequent investigation into the fraud led Kaiser to conclude that "Not Just Computers, Just Computers and DCNJC were variations of one business, Not Just Computers, located at the same address in Washington D.C. This is a small computer business owned by one of the primary suspects, Venus Baldwin." Kaiser's Report to Plaintiff, dated Dec. 13, 2000, at 5. All six of these checks were deposited in an account opened in the name of Not Just Computers.

Defendant First Union National Bank (First Union) was also a depository bank for checks deposited into an account opened in the name of Not Just Computers. According to the Complaint, First Union accepted two large checks for deposit into that account, one made out to NJC, Inc. and the other to "Just Computers."

Defendant SunTrust Bank (SunTrust) was the depository bank for two checks issued by Kaiser and made payable to Yates Technology, Inc. (Yates). Yates is a foreign corporation, incorporated in the Bahamas. The checks were deposited into a commercial checking account opened in the name of Yates Technology, Inc. SunTrust was also the depository bank for a third check issued by Kaiser in payment of a fraudulent invoice, this one made payable to Moffat Sales Corp. (Moffat). Moffat represented itself as having been incorporated in the District of Columbia, although it now appears that Moffat was never incorporated there, or elsewhere.

After discovering and investigating this fraudulent scheme, Kaiser brought suit, and obtained judgments against many of the intended payees in the Circuit Court for Montgomery County, Maryland. Alleging that Not Just Computers is a "corporation organized and existing under the laws of the District of Columbia," that it "also trades as NJC, Inc. and DCNJC, Inc.," and that Just Computers "may be a trade name or alter ego for Not Just Computers," Second Amended Complaint at 5, *Kaiser Foundation Health Plan of the Mid–Atlantic States, Inc v. Venus Baldwin, et al.,* Civil Action No. 213932 (the

*Baldwin* state court action), Kaiser was able to obtain a judgment against Not Just Computers that represented the total amount of all checks made payable to Not Just Computers, NJC, Inc., DCNJC, Inc. and Just Computers. In that same action, Kaiser obtained a judgment against Yates Technology, Inc. for the total amount of the two Yates checks. In a separate action in the Circuit Court for Montgomery County, Maryland, *Kaiser Foundation Health Plan of the Mid–Atlantic States, Inc. v. Moffat Sales Corp.*, Civil Action No. 21457, (the *Moffat* state court action) Kaiser obtained a default judgment against Moffat for an amount that includes the amount of the Moffat check.

In addition to the suits brought against the payees, Kaiser also submitted a claim to its insurance carrier, Plaintiff National Union Fire Insurance Co., for reimbursement of its losses under its Comprehensive Dishonesty, Disappearance and Destruction policy. As a result of this claim, Plaintiff paid Kaiser $852.506.68 to compensate Kaiser for its losses related to the fraudulent invoice scheme. Plaintiff then brought this subrogation action against the five banks that accepted for deposit the checks at issue. Plaintiff brought claims of Negligence, "Money Had and Received," and Conversion against each of the depository banks, as well as a claim of Breach of a Restrictive Indorsement against Defendants Allfirst and First Union. Plaintiff subsequently settled its claims against one of the defendant banks, Chevy Chase Bank, F.S.B.

The undersigned dismissed the claims against Bank of America on the ground that Plaintiff's claims against that defendant did not meet the amount in controversy for diversity jurisdiction. Plaintiff then filed a second suit in this Court against Bank of America, restating the same negligence claim, but inflating the amount in controversy as to the remaining claims by adding allegations regarding subsequent wire transfers received by Bank of America into an account in the name of Venus Baldwin. In an opinion issued earlier this year, Judge Frederick Smalkin dismissed the claims for "money had and received" and for conversion for failure to state a claim. As to the former claim, Judge Smalkin held that "[b]ecause the Bank of America *retains* none of the proceeds of the particular check at issue ..., there can be no action under Maryland law for money had and received." *National Union Fire Insurance Co. v. Bank of America,* 240 F.Supp.2d 455, 457 (D.Md.2003) (emphasis in original). As to the later claim, Judge Smalkin observed that Plaintiff, as the subrogee of drawer or issuer of the check, "is specifically precluded from maintaining an action for conversion of the check" under § 3–420(a)(i) of the Uniform Commercial Code. *Id.* at 458.

The three remaining Defendants now move for summary judgment as to all claims brought against them. For the reasons that follow, the Court finds that they are entitled to that relief.

## II. LEGAL STANDARD

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to summary judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). For purposes of summary judgment, a dispute about a fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if, when applied to the substantive law, it affects the outcome of litigation. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

A party seeking summary judgment bears the initial responsibility of informing the court of the basis of its motion and identifying the portions of the opposing party's case which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When considering the motion, the court assumes that all of the non-moving party's evidence is worthy of belief and justifiable inferences are drawn in favor of the non-moving party. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). If the movant demonstrates that there is no genuine issue of material fact and that she is entitled to summary judgment as a matter of law, the non-moving party must, in order to withstand the motion for summary judgment, produce sufficient evidence in the form of depositions, affidavits or other documentation which demonstrates that a triable issue of fact exists for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. The existence of only a "scintilla of evidence" is not enough to defeat a motion for summary judgment. Instead, the evidentiary materials must show facts from which the finder of fact could reasonably find for the non-moving party. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. At the summary judgment phase, it is not appropriate for the court to make credibility determinations, weigh the evidence, or draw inferences from the facts which are adverse to the nonmoving party; these are jury functions. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505.

### III. DISCUSSION

#### A. Merger and Bar Doctrine

■ In addition to the arguments raised in common with the other Defendants and which are discussed below, Defendant Suntrust also argues that all claims against it

are precluded under the doctrine of merger and bar, and the related defense of res judicata. This argument arises out of garnishment proceedings that Kaiser initiated as part of the *Moffat* and *Baldwin* state court actions, in which Suntrust was named as garnishee. In the *Baldwin* action, Kaiser obtained a judgment against Suntrust for $954.00, the amount of funds remaining in the account of Yates Technology, Inc. In the *Moffat* action, Kaiser's judgment against Suntrust was for $864.05, the amount remaining in the account of Moffat Sales Corp. Suntrust maintains that these judgments bar any further actions related to this same fraudulent scheme.

Plaintiff's primary response to this portion of Suntrust's motion focuses on the fact that the garnishment actions were actions *in rem*, where this is an action *in personam*. *See* Opp. to Suntrust Mot. at 32. According to Plaintiff, the garnishment action has no prospective significance, " 'other than to foreclose any persons from later seeking rights in the property subject to the *in rem* action.' " *Id.* at 32 (quoting *R.M.S. Titanic, Inc. v. Haver*, 171 F.3d 943, 957 (4th Cir.1999)). Plaintiff also argues that the garnishment proceeding cannot have any *res judicata* effect on this proceeding because the parties are not the same: Suntrust is a *defendant* in this action, but only a *garnishee* in the *Moffat* and *Baldwin* actions. *Id.* at 33.

■ While the Court agrees with Plaintiff that the instant action is not barred, it does so for different reasons. There is no absolute rule that a garnishment action cannot be given preclusive effect in a later *in personam* action against a garnishee. As stated in one of the decisions relied upon by Plaintiff, the doctrine of *res judicata* applies "without regard to the form of the earlier action. A final judgment on

the merits in favor of the garnishee in an attachment proceeding is conclusive as between the plaintiff and the garnishee in a subsequent action as far as the issue decided in the garnishment proceeding is concerned." *De Maio v. Lumbermens Mutual Casualty Company,* 247 Md. 30, 34, 230 A.2d 279 (1967); *see also, Buck Creek Industries, Inc. v. Alcon Construction, Inc.,* 631 F.2d 75 (5th Cir.1980) (giving garnishment decision *res judicata* effect in subsequent action against garnishee for fraudulent conveyance).

■ Where Suntrust's argument falters, however, is that the two cases arise out of two different "causes of action." One of the requisite elements for the doctrine to apply is that the two actions relate to a single "cause of action." *See, MPC, Inc. v. Kenny,* 279 Md. 29, 32, 367 A.2d 486 (1977). "In Maryland, whether causes of action are the same for *res judicata* purposes is decided by the 'same evidence' test: the requisite identity of causes of action is present if the evidence necessary to support a judgment for the plaintiff in the second case would have sustained a judgment for her in the first." *Ellett v. Giant Food, Inc.* 66 Md.App. 695, 702–703, 505 A.2d 888 (1986). The evidence in the *Baldwin* and *Moffat* actions related to the conduct of Mack, Baldwin and their accomplices in causing the checks to issue. The issues in this action relate to the conduct of the Defendant Banks in opening the subject accounts and processing the checks. While these two "causes of action" obviously share a sequential connection, they are not sufficiently identical so as to implicate *res judicata.*

### B. Plaintiff's Negligence Claims

■ Plaintiff readily acknowledges that it cannot bring a negligence claim against any of the Defendants under common law principles. As Kaiser was not a customer of any of the Defendants, nor did it have any other direct relationship with them, there was no duty of care owed to Kaiser by Defendants at common law. As the Fourth Circuit recently observed under somewhat similar circumstances,

> a bank does not owe a duty of care to a noncustomer with whom the bank has no direct relationship.... [A] bank's failure to investigate a customer's suspicious activity ... does not give rise to liability to the third party who is injured by the customer's fraud. The mere fact that a bank account can be used in the course of perpetrating a fraud does not mean that banks have a duty to persons other than their own customers. To the contrary, the duty is owed exclusively to the customer, not to the persons with whom the customer has dealings. [T]o extend a duty of care to strangers ... would be contrary to the normal understanding of the purpose of a bank account and would expose banks to unlimited liability for unforeseeable frauds.

*Eisenberg v. Wachovia Bank, N.A.,* 301 F.3d 220 (4th Cir.2002).

Instead, Plaintiff turns to Article 3 of the Uniform Commercial Code (UCC) to ground its "negligence" claim. Plaintiff argues that under §§ 3–404, 3–405, and 3–406, an affirmative cause of action, in negligence, can be brought against a depository bank by drawers and payees.[2] These sections of the UCC, Plaintiff observes, introduce a concept of comparative negligence reflecting a " 'determination that all participants in the process have a duty to exercise ordinary care in the drawing and handling of instruments and that the failure to exercise that duty will result in liability to the person sustaining the loss.' "

---

**2.** These sections of the UCC are codified in the Maryland Code at Md.Code. Ann., Com. Law I §§ 3–404, 3–405, and 3–406.

Pl.'s Opp.[3] at 12 (quoting *Gina Chin & Assocs. v. First Union Bank*, 256 Va. 59, 500 S.E.2d 516 (1998)).

■ Defendants argue strenuously that these sections of the UCC only serve to establish various *defenses* available to depository banks, and not causes of action against those banks. The cases and the commentators, however, would indicate otherwise. *See Gina Chin, supra; National Union Fire Insurance v. Hibernia National Bank*, 258 F.Supp.2d 490, 493 (W.D.La.2003) ("The plain language of these statutes provides a cause of action for comparative negligence."); *Sebastian v. D & S Express, Inc.*, 61 F.Supp.2d 386 (D.N.J.1999); 2 James White and Robert Summers, *Uniform Commercial Code*, § 19–3 at 247 (4th Ed.1995) ("3–406 and the accompanying sections carry with them something that did not exist under the old Code, namely, a new cause of action."). While the Court agrees that these sections of Article 3 create the potential for causes of action against depository banks, the Court finds that the factual circumstances presented here do not give rise to those causes of action, notwithstanding Plaintiff's often imaginative efforts to bend and twist the language of these statutes.[4]

■ As its title would indicate, Section 3–405 addresses situations where an employer has suffered a loss as the result of the fraudulent indorsement by one of its employees. *See* Md.Code. Ann., Comm. Law I § 3–405 (entitled, "Employer's responsibility for fraudulent indorsement by employee"). This section's definitional section includes the following:

(a) In this section:

(2) "Fraudulent indorsement" means (i) in the case of an instrument payable to the employer, a forged indorsement purported to be that of the employer, or (ii) in the case of an instrument with respect to which the employer is the issuer, *a forged indorsement* purporting to be that of the person identified as payee.

*Id.* at § 3–405(a)(2) (emphasis added).

Here, Plaintiff can make no credible claim that any of the checks at issue had forged indorsements. Instead, and despite the clear language of the statute, Plaintiff argues that "a fraudulent indorsement, as operationally defined in the statute, does not require a forged indorsement." Pl.'s Opp. at 22.[5] Uncertain as to how an "op-

---

3. For whatever reason, the parties elected to reiterate in numerous pleadings large portions of their arguments: Defendants have simply copied large sections of their co-Defendants' pleadings, and Plaintiff has resubmitted the bulk of the same pleading three times in opposition to each of Defendants' motions. In addition, because Plaintiff chose to ignore this Court's local rules regarding the coordination of the filing of cross-motions, *see* L.R. 105.2.c, Plaintiff repeats some of the same language in both its motions and its oppositions. Except where otherwise noted, the Court will cite to Allfirst's motion, and Plaintiff's opposition to that motion.

4. Defendants' interpretation of the statutes is essentially just a different route to the same result. Defendants maintain that these provisions are not implicated unless the signatures that appear either on the face or the back of a check are not effective, *i.e.*, the signatures are forged, unauthorized, or altered. *See* Allfirst Mot. at 12–13. Each of the conditions described in §§ 3–404, 3–405, or 3–406 would imply, of necessity, the presence of either a forged signature, a forged indorsement or an alteration. As Defendants observe, Plaintiff has not pointed to a single case or commentator, addressing these sections, that recognizes a cause of action for the issuer of a check against the depository bank where the check in question did not contain one of these three essential elements. *See* Allfirst Reply at 2.

5. In support of this argument, Plaintiff relies on *Prudential–Bache Securities, Inc. v. Citibank, N.A.*, 73 N.Y.2d 263, 539 N.Y.S.2d 699, 536 N.E.2d 1118 (1989). *Prudential–Bache* was decided under a version of § 3–405 that, unlike the current revised version, did not

erational definition" can directly conflict with an actual definition, the Court looks to the plain language of the definition provided in the statute and finds § 3–405 inapplicable here.

■ The Court finds § 3–406 equally inapplicable. This section is implicated where the "failure to exercise ordinary care substantially contributes to an alteration of an instrument or to the making of a forged signature on an instrument." § 3–406(a). Acknowledging that this provision applies only where there are alterations or forgeries, and at least implicitly acknowledging that there were no "alterations" or "forgeries" on the checks at issue, as those terms are ordinarily understood, Plaintiff again turns to an "operational definition" of the term "forgery." Pl.'s Opp. at 23–25. Plaintiff notes that in one of the illustrative cases presented in the official comments to the UCC, a signature generated by an employee's unauthorized use of the employer's rubber signature stamp would be considered a "forged signature." *Id.* at 24 (citing § 3–406 Comment 3, Case # 1). Plaintiff then argues that, because "Mr. Mack caused forged signatures to be applied to approvals for the payment of fraudulent invoices that caused Kaiser … to direct[ ] its vendor Moore Business Forms[6] to issue checks in payment of the invoices containing the machine-generated signature of Kaiser," Mack "effectively obtained unauthorized access to Kaiser's signature stamp and placed it on the checks here, albeit in today's computer-orientated business environment." *Id.* at 24.

Again, the Court will rely on the plain language of the statute, not Plaintiff's tortured definition. Under Plaintiff's theory, any fraudulent scheme that involves the

issuance of a check would involve a "forgery" and could be swept into the reach of § 3–406. This would appear to be true, under Plaintiff's interpretation, even if Mack had submitted the fraudulent invoice directly to the individual with signing authority, who then manually signs the check. The Court, however, finds no support in the statute, in the comments, or in the cases, for such a broad definition of "forgery."

■ Section 3–404 of the UCC, by its plain language, addresses three factual situations. Subsection (a) addresses those situations in which "an impostor, by use of the mails or otherwise, induces the issuer of an instrument to issue the instrument to the impostor, or to a person acting in concert with the impostor, by impersonating the payee of the instrument or a person authorized to act for the payee." Md. Code. Ann., Com. Law. I § 3–404(a). Subsection (b)(i) applies where the "person whose intent determines to whom an instrument is payable (§ 3–110(a) or (b)) does not intend the person identified as payee to have any interest in the instrument." Subsection (b)(ii) relates to instances where the "person identified as payee of an instrument is a fictitious person." Plaintiff argues that the second and third provisions are applicable; the "intended payee" rule of (b)(i) and the "fictitious person" rule of (b)(ii).

In seeking to fit this action within the scope of Section 3–404(b)(ii), Plaintiff employs various arguments to convince the Court that the corporate payees should be considered "fictitious." As to Not Just Computers, Inc., Plaintiff points to the fact that its corporate status had been revoked

---

contain a definition of "fraudulent endorsement."

**6.** Moore Business Forms (Moore) is the offsite vendor utilized by Kaiser for the issuance

of checks. Kaiser would electronically send Moore invoices to be processed and Moore would then place an electronic drawer signature on the checks it issues in payment of the invoices.

by the District of Columbia in September of 1999. By inserting some of its own language into the Official Comments to § 3–404, Plaintiff concludes that this revocation rendered Not Just Computers, Inc. "fictitious." [7] In contrast, when discussing Yates, Plaintiff inserts yet another requirement into the definition of what § 3–404 means by "fictitious." Plaintiff had to acknowledge that Yates was validly incorporated, albeit in the Bahamas. Pl.'s Opp. to Suntrust Mot. at 16. Plaintiff concludes, however, that Yates is fictitious, because "the corporate existence of Yates is not recognized in this country. Although incorporated in the Bahamas, it was not registered to do business in this country." *Id.* Plaintiff does not provide any authority for the position that an entity is rendered fictitious if it is not incorporated and registered in this country.

As to at least some of the corporate payees, there is rather compelling evidence that they were certainly not fictitious. In addition to the uncontested fact that Yates was a validly incorporated entity, there is evidence in the record that Not Just Computers, Inc. was an ongoing business during the relevant time period despite the lapse of its corporate charter. Kaiser's fraud investigator testified that a member of his investigation team "drove by the business and said there is a legitimate business there." Dep. of William Lisanty at 206. One of the employees of First Union testified that he actually used the services of Not Just Computers on several occasions, in purchasing software and other computer equipment. Dep. at John Golding at 78–79.

■ The Court need not, however, reach the issue as to whether each of these corporate entities are or are not fictitious, or whether there is a genuine dispute of material fact as to this issue. The Court finds that Plaintiff is judicially estopped from contending that these entities are fictitious because of positions taken in previous litigation by Kaiser, in whose shoes Plaintiff now stands.

■ The doctrine of judicial estoppel precludes a party from asserting a position inconsistent with a position successfully taken by the same party or a party in privity in a prior lawsuit. "Acting on the assumption that there is only one truth about a given set of circumstances, the courts apply judicial estoppel to prevent a party from benefitting itself by maintaining mutually inconsistent positions regarding a particular situation." *King v. Herbert J. Thomas Memorial Hosp.,* 159 F.3d 192, 196 (4th Cir.1998). This Court recently summarized the scope of the doctrine:

In the Fourth Circuit, the doctrine applies where "(1) the party to be estopped asserts a position that is factually incompatible with a position taken in a prior judicial or administrative proceeding; (2) the prior inconsistent position must have been accepted by the tribunal; and (3) the party to be estopped must have taken inconsistent positions intentionally for the purpose of gaining unfair advantage." *King,* 159 F.3d at 196; *accord Sedlack v. Braswell Services Group, Inc.,* 134 F.3d 219 (4th Cir.1998); *Pittston Co. v. U.S.,* 199 F.3d 694, 701 (4th Cir.1999) ("Judicial estoppel applies only to the making of inconsistent statements of fact...."). Judicial estoppel does not require that the

---

**7.** Comment 2 to § 3–404 states that Subsection (b) "covers cases in which an instrument is payable to a fictitious or nonexisting person and to cases in which the payee is a real person but the drawer or maker does not intend the payee to have any interest in the instrument." In its opposition, and elsewhere, Plaintiff inserted after the word "fictitious," "[*i.e.,* a person that has no legal existence.]."

inconsistent position be actually litigated in prior proceeding or a showing of detrimental reliance by the party asserting its protections. *Lowery v. Stovall*, 92 F.3d 219, 223 n. 3 (4th Cir.1996). As an equitable doctrine, judicial estoppel is subject to the discretion of the district court and involves a fact specific inquiry. *King*, 159 F.3d at 196.

*Buckley v. Airshield Corp.* 116 F.Supp.2d 658, 671 (D.Md.2000).

As stated above, Kaiser took the position in the *Baldwin* state court action that Not Just Computers is a "corporation organized and existing under the laws of the District of Columbia," that "[i]ts principal place of business is 400 Seventh Street, N.W., Washington D.C.," and that it "also trades as NJC, Inc. and DCNJC, Inc." *Baldwin*, Second Amended Complaint at 5. Furthermore, Kaiser alleged that Just Computers, while not a corporation, "may be a trade name or alter ego for Not Just Computers." *Id.* Based upon these factual representations, Kaiser was able to obtain a judgment against Not Just Computers not just for the checks made payable to Not Just Computers, but for an amount equal to the full face value of all checks made payable to NJC, Inc., DCNJC, Inc. and Just Computers as well.

The factual allegations relative to Moffat and Yates in the state court actions are admittedly less specific. Plaintiff alleged in the *Baldwin* state court action that Yates was "an entity of unknown origin," whose "principal place of business is 604 Evening Star Place, 2nd Floor, in Mitchelville, Maryland." *Id.* Plaintiff also opined that Yates "may be a trade name or alter ego" of another defendant in that same action; Keith Beard. *Id.* In the *Moffat* state court action, Plaintiff alleged that while "Moffat Sales is not a corporation registered to do business in Maryland, and may be a trade name or alter ego," "Moffat Sales is doing business at 1207 Nova Avenue, Suite 1, Capital Heights, Maryland." *Moffat*, Complaint at 2. These allegations were sufficient to yield default judgments as to both of those entities.[8]

Plaintiff contends that Kaiser's representations concerning these entities in the *Baldwin* and *Moffat* actions were simply a result of "mistake or inadvertence," which it contends would be a defense to judicial estoppel. Pl.'s Opp. at 16 n.4. Plaintiff argues that, when Kaiser brought these actions, "only days after discovery of the fraud, Kaiser had little information about the persons and fraudulent payees it was suing, and plead what it knew." *Id.* The record reveals, however, that Kaiser twice amended the original complaint in the *Baldwin* action. In the Second Amended Complaint, Kaiser alleged that "Not Just Computers also trades as 'NJC, Inc.,'" and that Just Computers, while not a corporation, "may be a trade name or alter ego for Not Just Computers." Kaiser's fraud investigation, which was completed on December 13, 2000, concluded that "NJC, Inc., Not Just Computers, Just Computers and DCNJC were variations of one business, Not Just Computers, located at the same address in Washington, DC. This is a small computer business owned and operated by one of the primary suspects, Venus Baldwin." Allfirst's Exh. B at 5. More than a year after this investigation was completed, Kaiser participated in an evidentiary hearing on December 19, 2001, which led to the issuance of the judgment against Not Just Computers on December 26, 2001 that represented the total amount of the checks made payable to Not Just Computers, Just Computers, NJC, Inc., and DCNJC.

---

**8.** It appears that Plaintiff's alter ego theory also allowed Plaintiff to obtain judgment against Beard for the full face value of the Yates checks.

As to Yates Technologies and Moffat Sales, while the specific allegations relative to those entities are less explicit, Kaiser's previous litigation posture as to those entities is plainly inconsistent with Plaintiff's current assertion that they are fictitious entities. Yates Technology was described as an entity of unknown origin, with a particular principal place of business that might be a trade name or alter ego for a Keith Beard. Again, after an evidentiary hearing, Kaiser was able to obtain a judgment against Yates Technologies. Moffat Sales was described as doing business at a particular location, and was also described as perhaps a trade name or alter ego. It was not until almost one year after filing suit, that Kaiser obtained judgment against Moffat Sales.

Thus, none of these judgments were, as Plaintiff would have the Court conclude, the inadvertent result of Kaiser's hasty assumptions formed only days after discovering the fraud. They came as a result of a deliberate and lengthy course of conduct in litigation. Now, apparently having found those judgments uncollectable, Plaintiff seeks to take a new and inconsistent position as to those entities so that it can reach new defendants. As the Fourth Circuit has opined, "[t]o allow [a party] to obtain benefits from two sources based on two incompatible positions, simply because the positions aid [the plaintiff's] claims for remuneration, would reduce truth to a mere financial convenience and would undermine the integrity of the judicial process." *King*, 159 F.3d at 198.

█ Plaintiff next argues that should the Court not agree that the payees were fictitious, § 3–404 could still be applicable under the "intended payee" rule of (b)(i). Section 3–110(b) of the Commercial Law Article, which is referenced by § 3–404(b)(i), states that "if the signature of the issuer of an instrument is made by automated means, such as a check-writing machine, the [intended] payee of the instrument is determined by the intent of the person who supplied the name or identification of the payee, whether or not authorized to do so." Here, Plaintiff agrees that it is the intent of "Mack and his accomplices who submitted each of the invoices" that the Court must consider. Pl.'s Opp. at 18. Plaintiff argues that "Mack and his accomplices did not intend the fictitious [named corporate payees] to have an interest in the checks because they intended the funds to go [to] themselves as those payees either did not exist or were just a conduit to launder the funds to Mack and his accomplices." Pl.'s Opp. at 19.

Subsection (b)(i) states that it applies where the person whose intent is determinative "does not intend the person identified as payee to have any interest in the instrument." Here, it is the essence of Plaintiff's basic theory of the fraudulent scheme that Mack intended the named payees to have an interest in the check, if only so that Mack or his accomplices could then have access to those funds. Plaintiff provides no support for its suggestion that the identified payees must obtain some permanent interest in the proceeds of the instrument. Such an interpretation would obviously be unworkable.

### C. Claims for Money Had and Received and Conversion

As mentioned above, in his January 15, 2003 decision in *National Union Fire Ins. Co. v. Bank Of America*, Judge Smalkin dismissed claims for money had and received and for conversion brought by Plaintiff against the Bank of America. 240 F.Supp.2d 455 (D.Md.2003). Plaintiff makes no effort to distinguish these claims factually from those brought against Defendant Banks in the instant action.

Plaintiff simply argues that Judge Smalkin's decision was wrong.

On July 21, 2003, Plaintiff submitted a pleading which informed the undersigned that Judge Smalkin's decision was vacated on July 15, 2003 and, as such, "it is no longer good law upon which this Court may rely in considering the Defendants' motions for summary judgment." Pl.'s Report on Vacatur at 2. What Plaintiff's pleading did not explain, however, is that the decision was vacated, not because Judge Smalkin had reconsidered and altered his conclusions, but because Plaintiff had requested that vacatur, and the request was granted as an unopposed motion and without comment by Judge William Quarles. Responding to Plaintiff's "Report on Vacatur," Defendants informed the undersigned that Plaintiff sent a letter to Judge Quarles requesting the vacatur as a condition for its settlement of the pending appeal of the claims against Bank of America. As the "exceptional circumstances" justifying vacatur, Plaintiff cited its "institutional interest" as a "repeat player in the courts" "in vacating adverse rulings of potential precedential value." April 17, 2003 letter from Plaintiff's counsel to Judge Quarles at 2.

■■■ Plaintiff is correct that, as a vacated decision, Judge Smalkin's opinion has no binding precedential value. Of course, no decision of a district court judge is technically binding on another district court judge, even within the same district. See Bryant v. Smith 165 B.R. 176, 180–181 (W.D.Va.1994). Opinions of other district judges are, however, "persuasive authority entitled to substantial deference," id., but this remains true whether or not "repeat players" are successful in their attempts to have adverse rulings vacated. The undersigned hereby adopts Judge Smalkin's conclusion, not because it is binding, but because it is compelling. For the reasons stated by Judge Smalkin, the Court will dismiss Plaintiff's claims for money had and received and for conversion.

### D. Breach of Restrictive Indorsement

■■■ Plaintiff's breach of restrictive indorsement claims against Allfirst and First Union are premised on the assertion that these defendants accepted for deposit into the account of Not Just Computers, Inc. checks made payable to "Just Computers," "NJC, Inc.," and "DCNJC" that were indorsed "for deposit only." As discussed above, however, the "intended payee," for Article 3 purposes, for each of the checks was Not Just Computers, Inc., and each of the checks was deposited in accounts of Not Just Computers, Inc. Where the intended payee actually receives the proceeds of the check at issue, there is no liability for breach of a restrictive indorsement, even it there is an improper indorsement, or no indorsement. See Coplin v. Maryland Trust Co., 222 Md. 119, 159 A.2d 356 (1960).

### E. Plaintiff's Motions

■■■ Plaintiff moved for summary judgment against Defendant Allfirst alleging that Allfirst failed to meet its burden of proving that it acted in good faith in the manner in which it opened and monitored the Not Just Computers, Inc. account. Plaintiff argues that this lack of good faith precludes Allfirst from asserting the comparative negligence defense under §§ 3–404, 3–405, and 3–406, and renders it "strictly liable" under those statutes. Because the Court finds those statutes inapplicable in this context, Plaintiff's motion must be denied.

Plaintiff raises a similar argument in its motion for summary judgment against Defendant First Union. First Union has indicated that it is unable to locate the opening documents for the Not Just Computers, Inc. account. Because the lack of

documents precludes First Union from demonstrating good faith in the opening of the account, Plaintiff contends that summary judgment should be entered against it under a spoliation of evidence theory. Again, because the Court finds no basis to impose liability on First Union under the statutes, these opening documents become irrelevant. This motion will also be denied.

 Finally, Plaintiff has filed a motion for leave to amend the complaint. Most of the proposed amendments simply seek to add conclusory allegations in an attempt to bolster the legal arguments that the Court has rejected or found irrelevant. Plaintiff also seeks, however, to insert into this litigation additional claims related to a check for $7,879.57 made out to "Phico Insurance Co." that First Union allegedly accepted for deposit into the Not Just Computers account.

The Court will deny this motion was well. Allegations to support Plaintiff's rejected legal theories would obviously be futile. The Court finds the claims related to the Phico check are untimely raised. Plaintiff did not file the motion to amend the complaint until the day that discovery closed. Thus, there was not an adequate opportunity to take discovery relative to this check, and it appears to fall outside the scheme that was common to the other checks. In addition, with the dismissal of all other claims, the claim related to this single check is below the amount in controversy for this Court's jurisdiction.

## IV. CONCLUSION

For the above stated reasons, Defendant's motions for summary judgment will be granted, and Plaintiff's motions for summary judgment denied. A separate order will issue.

## ORDER

Accordingly, IT IS this 3rd day of September, 2003, by the United States District Court for the District of Maryland, ORDERED:

1. That Plaintiff's Motion for Leave to File Supplemental Memorandum in Opposition to Defendants' Motions for Summary Judgment Based on New Authority, Paper No. 110, is GRANTED;

2. That Plaintiff's Motion for Leave to File Supplemental Memorandum in Opposition to Defendants' Motions for Summary Judgment, Paper No. 122, is DENIED;

3. That Defendant Suntrust Bank's Motion for Leave to File Amended Answer, Paper No. 79, is GRANTED;

4. That Plaintiff's Motion for Leave to Amend Complaint, Paper No. 80, is DENIED;

5. That Defendant Allfirst Bank's Motion for Summary Judgment, Paper No. 71, is GRANTED;

6. That Defendant Suntrust Bank's Motion for Summary Judgment, Paper No. 73, is GRANTED;

7. That Defendant First Union National Bank's Motion for Summary Judgment, Paper No. 78, is GRANTED;

8. That Plaintiff's Motion for Summary Judgment against Defendant First Union National Bank, Paper No. 75, is DENIED;

9. That Plaintiff's Motion for Partial Summary Judgment against Defendant Allfirst, Paper No. 76, is DENIED;

10. That this action is hereby CLOSED;

11. That any and all prior rulings made by this Court disposing of any claims against any parties are incorporated by reference herein and this order shall be

deemed to be a final judgment within the meaning of Fed.R.Civ.P. 58; and

12. That the Clerk of the Court shall mail or transmit copies of this Memorandum and Order to all counsel of record.